# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TENNESSEE
# AT CHATTANOOGA

| | |
|---|---|
| **ARTELIA PHELPS,** | Case No. 1:21-cv-267-CEA-SKL |
| Plaintiff, | |
| vs. | District Judge Charles E. Atchley |
| **DILLARD'S, INC.,** | Magistrate Judge Susan K. Lee |
| Defendant. | |
| | Jury Demanded |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Defendant, Dillard Tennessee Operating Limited Partnership, improperly named Dillard's Inc., ("Dillard's") requests that the Court grant it summary judgment pursuant to Federal Rule of Civil Procedure 56.

## SUMMARY OF ARGUMENT

While Artelia Phelps' Complaint lays out a compelling story of intentional discrimination she experienced while shopping – it is just that - a story. As discovery has unfolded, the events on November 3, 2020 at Dillard's' department store have been more clearly revealed – showing that many of Phelps' claims fail. The most illuminating piece of discovery is the video Phelps produced that depicts the incident in which Phelps and her shopping companions were questioned by Dillard's employees, including a security officer, about tags removed from garments, and then Phelps was searched. The entire incident that is the crux of this lawsuit spans only approximately 10 minutes.

As further shown below, based on the undisputed material facts, Phelps cannot succeed on the following claims: (1) racial discrimination in violation of section 1981 (D.E. 1 at ¶¶ 47-56),

(2) malicious harassment under the Tennessee Human Rights Act (*id.* at ¶¶ 65-67), (3) intentional infliction of emotional distress (*id.* at ¶¶ 68-73), (4) invasion of privacy through false-light publicity (*id.* at ¶¶ 74-77), (5) negligent infliction of emotional distress (premises liability) (*id.* at ¶¶ 78-82), and (6) negligent infliction of emotional distress (hiring and retention) (*id.* at ¶¶ 83-86).

**STATEMENT OF FACTS**

The following facts are taken as true solely for the purpose of this Motion for Summary Judgment. Should the case proceed beyond Dillard's' present motion, Dillard's reserves its right to contest certain facts at trial in accordance with Fed. R. Civ. P. 56(c)(1)(A).

On November 3, 2020, Artelia Phelps ("Phelps"), Lashonda Appling ("Appling"), and Shondrick Appling-Stewart ("Stewart") visited Dillard's department store at the mall at Hamilton Place. (Phelps Dep. at 39:24–40:2, 41:14–42:8, 44:17–45:15 (excerpts attached to Motion as **Exhibit 1**)). Phelps, Appling, and Stewart entered the store to look at an evening gown for Appling. (Phelps Dep. at 41:14–42:8) ("I agreed to go to the mall with her [Appling] to shop quickly and find her [Appling] an evening gown or something with sequins for this event."), 81:8-11 ("LaShonda is the one who needed one [an evening gown]."); (Appling Dep. at 17:23-18:3 (excerpts attached to Motion as **Exhibit 2**) ("I was looking for an evening gown. . . So we were out there looking for me a gown to wear or pants or whatever I could find."), 18:12-17 ("Q: [W]as the shopping just for you – A: Yes."). Phelps and Appling found two evening gowns for Appling to try on. (Phelps Dep. at 55:4–55:12). After selecting the evening gowns, Phelps went to the restroom (Phelps Dep. at 50:1–50:15) after a "nice" Dillard's employee helped her locate it, (Phelps Dep. at 73:15–16) ("I just remember her being so nice"), and Appling went to the dressing room to try on the gowns. (Phelps Dep. at 50:11–50:23). After Phelps left the restroom, she went

2

to the dressing rooms where Appling was still trying on the gowns. (Phelps Dep. at 50:11–50:23). Phelps did not go inside the dressing room. (Phelps Dep. at 76:8-10).

While Appling was still trying on the gowns, "loss prevention," including a black employee, a white employee, and a police officer, approached Phelps and her shopping companions (the "Incident"). (Phelps Dep. at 77:13-25) ("[T]he black male loss prevention and the white female loss prevention accompanied by that same police officer, all three walked together over to us at the dressing room."). The black male loss prevention employee asked Phelps "where are the bags" when he approached. (Phelps Dep. at 79:11-80:17). Phelps told the black male loss prevention officer "We literally just got here. We haven't even had a chance to shop yet. . . **We ain't shopped yet**." (Phelps Dep. at 79:11-80:17) (emphasis added). Phelps did not have time to find anything to purchase before the Dillard's employees approached her during the Incident. (Phelps Dep. at 81:12–13) ("Q: Did you find an evening gown? A: I didn't have time.").

The black male loss prevention employee explained to Phelps "we're looking for the jeans that go with these tags." (Phelps Dep. at 79:11-80:17, 81:1-7). The black male loss prevention employee was holding tags removed from a clothing garment. (Phelps Dep. at 81:2–7, 83:12–18; First Phelps Cellphone Video, at 0:32–0:38 (Nov. 3, 2020) (Notice of Manual Filing attached to Motion as **Exhibit 3**)), and the Dillard's employees asked Phelps where the jeans were. (Phelps Dep. at 81:2–7, 110:17–23). The Dillard's employees, including the officer, then entered the dressing room area and searched it. (Phelps Dep. at 83:20–84:11).

The officer then handcuffed Phelps under suspicion of theft. (Phelps Dep. at 99:1–5; Second Phelps Cellphone Video, at 0:20–1:07 (Nov. 3, 2020) (Notice of Manual Filing attached to Motion as **Exhibit 4**)). The officer clarified that Phelps was being detained, not arrested. (Phelps Dep. at 118:14–17; Ex. 4, at 0:28–0:54). The officer then searched Phelps for stolen merchandise.

3

(Phelps Dep. at 99:23–101:14; Ex. 4, at 1:18–3:36). The officer remained calm and never threatened any injury to Phelps. (*See* Ex. 3; Ex. 4; Phelps Dep. at 111:2-7 (admitting the officer "didn't verbally threaten me.")). Instead, the security officer told Phelps she was trying to "squash this and get you out of here." (Ex. 4). Phelps was not physically injured during the incident. (Phelps Dep. at 129:20-22). The individuals in the area at the time of the incident were Dillard's store employees. (*See* Exs. 3, 4; Stewart Dep. at 34:15-35:19 (listing the employees around the dressing room at the time of the incident, showing that all individuals seen in Exhibits 3 and 4, other than Phelps and her shopping companions, were store employees) (excerpts attached to Motion as **Exhibit 5**).

After Phelps was searched, Phelps, Appling, and Stewart were free to leave Dillard's, which they chose to do. (Phelps Dep. at 102:15–19 ("And I told LaShonda, 'Let's go. We got to get out of here.'" and then "[w]e left.'"); Ex. 4, at 3:40–4:10). Phelps was in handcuffs for no longer than five minutes. *See generally* Ex. 4. The entire incident that is the crux of this lawsuit spans only approximately 10 minutes. (Stewart Dep. at 41:25-42:3). No Dillard's employee asked Phelps and her shopping companions to leave the store. (*See generally* Ex. 4; Phelps Dep. at 90:2-6 ("Q: They verbally said 'leave the store.'[?] A: No."), 127:20-128:4 (explaining that in the moments after the captured video ended no one from Dillard's said anything else to her).

## STANDARD GOVERNING MOTION FOR SUMMARY JUDGMENT

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of conclusively showing the lack of any genuine issue of material fact. *Smith v. Hudson*, 600 F.2d 60, 63 (6th Cir. 1979). The movant may meet its burden by showing the non-moving party has failed to provide evidence to

4

support an essential element of its case. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

To successfully oppose a motion for summary judgment, "the non-moving party . . . must present sufficient evidence from which a jury could reasonably find for him." *Jones v. Muskegon Cnty.*, 625 F.3d 935, 940 (6th Cir. 2010). In ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of the nonmoving party. *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). But "the nonmoving party must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). If a court concludes, based on the record, that a fair-minded jury could not return a verdict in favor of the non-movant, the court should grant summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

## LAW AND ARGUMENT

### I. Phelps' claim for racial discrimination in violation of Section 1981 fails.

Phelps' claim for racial discrimination in violation of Section 1981 (D.E. 1 at ¶¶ 47-56) fails, because Phelps cannot prove she sought to make or enforce a contract for services Dillard's ordinarily provides. Section 1981 prohibits intentional race discrimination in the making and enforcing of contracts with both public and private actors. 42 U.S.C. § 1981. The statute's protection extends to "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id*. at § 1981(b).

To prevail in a § 1981 racial discrimination claim based upon circumstantial evidence, a plaintiff must meet the burden-shifting standard for Title VII cases the Supreme Court established

5

in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *Christian v. Wal-Mart Stores, Inc.*, 252 F.3d 862, 868 (6th Cir.), *opinion supplemented on denial of reh'g*, 266 F.3d 407 (6th Cir. 2001). Under this standard, plaintiffs first must present a prima facie case of discrimination by a preponderance of the evidence. *Id*. The burden then shifts to defendants to articulate a legitimate, non-discriminatory reason for their actions. *Id.* Plaintiffs must then show that defendants' proffered reason is not the true reason, but a pretext for discrimination. *Id.*

> In a § 1981 commercial establishment case, a plaintiff must prove:
>
> (1) Plaintiff is a member of a protected class;
>
> (2) Plaintiff sought to make or enforce a contract for services ordinarily provided by the defendant; and
>
> (3) Plaintiff was denied the right to enter into or enjoy the benefits or privileges of the contractual relationship in that (a) plaintiff was deprived of services while similarly situated persons outside the protected class were not and/or (b) plaintiff received services in a markedly hostile manner and in a manner which a reasonable person would find objectively discriminatory.

*Id.* at 872.

While it is agreed that Phelps is a member of a protected class, there is no evidence to show that Phelps "sought to make or enforce a contract for services ordinarily provided by the defendant," which is the second prong of the prima facie case. *Id.* The Sixth Circuit in *Christian* indicated that to satisfy the "make and enforce contracts" clause in the commercial context, a plaintiff must show "she intended to make a purchase and was asked to leave the establishment in order to prevent her from making the purchase on account of her race. . ." 252 F.3d at 873 (citing *Watson v. Fraternal Order of Eagles*, 915 F.2d 235, 243 (6th Cir. 1990)). The court in *Christian* found plaintiff sought to enter a contract ordinarily provided by the defendant store, noting that plaintiff "had selected merchandise to purchase, had the means to complete the transaction, and would, in fact, have completed her purchase had she not been asked to leave the store." *Id*. at 874.

Other courts that have considered the clause have held that a plaintiff must allege interference with an actual, as opposed to speculative contract interest. In *Morris v. Office Max*, 89 F.3d 411 (7th Cir.1996), two African-American men entered an Office Max store a few minutes before closing time. While the two men were browsing, a store clerk telephoned the police to report "two male blacks acting suspiciously." *Office Max*, 89 F.3d at 412. Prior to the arrival of the police, one of the men selected certain merchandise and made a purchase. After making his purchase, he rejoined his companion in the store. When the police arrived, they briefly questioned the men and determined that there was nothing amiss. The two men sued, contending that the store violated the "make and enforce contracts" clause. The Seventh Circuit affirmed the dismissal of their claim because there was no evidence that the store had violated § 1981. *Id.* at 414–15. "They were denied neither admittance nor service, nor were they asked to leave the store." *Id.* at 414. Further, the court rejected the plaintiffs' claim that the store interfered with their "prospective contractual relations," concluding that their claim was "speculative and insufficient to state a claim under § 1981." *Id.* A claim for interference with the right to make and enforce a contract must allege the actual loss of a contract interest, not merely the possible loss of future contract opportunities." *Id*. at 414-15.

Similarly, in *Hampton v. Dillard Dep't Stores, Inc*., 247 F.3d 1091, 1117-18 (10th Cir. 2001), the Tenth Circuit rejected an African-American woman's § 1981 claim that her ejection from a store was racially-motivated because she failed to show that she planned or attempted to make a purchase at the store. The court refused to extend § 1981 "beyond the contours of a contract" and held that "there must have been interference with a contract beyond the mere expectation of being treated without discrimination while shopping." *Hampton*, 247 F.3d at 1118.

7

Finally, in *Morris v. Dillard Dep't Stores, Inc.,* 277 F.3d 743, 751-53 (5th Cir.2001), the Fifth Circuit upheld the district court's grant of summary judgment in favor of the store on plaintiff's § 1981 claim. Plaintiff had been browsing in the store when a store employee alerted security that she suspected plaintiff of shoplifting. *Morris*, 277 F.3d at 746. The security officer followed plaintiff to the parking lot and copied down her license plate. *Id.* Plaintiff returned to the store to confront the security officer. *Id.* At that time she was accused of shoplifting, arrested, searched and temporarily banned from the store. *Id.* at 746-47, 751. In analyzing plaintiff's § 1981 claim, the court held that she was required to "establish the loss of an actual, not speculative or prospective, contract interest." *Id*. at 751. The court held that there was no evidence indicating that plaintiff "made any tangible attempt to purchase, or to return, specified goods at the store, or to enter any other contractual agreement with Dillard's, at any time during the course of the ban." *Id*. at 753. Accordingly, her claim was denied. *See also Sterling v. Kazmierczak*, 983 F. Supp. 1186, 1191–92 (N.D. Ill. 1997) (granting defendant's motion to dismiss where plaintiff failed to allege that he was prepared to purchase air rifle cartridges or that he had them "in hand" when confronted by police officer).

Phelps cannot show she sought to make or enforce a contract for services that Dillard's normally provides. Prior to Phelps' interaction with Dillard's employees during the incident, Phelps, Appling, and Stewart entered the store to look at an evening gown for Appling – not for Phelps. (Phelps Dep. at 41:14–42:8) ("I agreed to go to the mall with her [Appling] to shop quickly and find her [Appling] an evening gown or something with sequins for this event."), 81:8-11 ("LaShonda is the one who needed one [an evening gown]."); (Appling Dep. at 17:23-18:3 ("I was looking for an evening gown. . . So we were out there looking for me a gown to wear or pants or

8

whatever I could find."), 18:12-17 ("Q: [W]as the shopping just for you – A: Yes."). Phelps and Appling found two evening gowns for Appling to try on. (Phelps Dep. at 55:4–55:12).

During the Incident, Phelps made it clear she and Appling "haven't even had a chance to shop yet . . . We ain't shopped yet." (Phelps Dep. at 79:11-80:17). Phelps had not found anything to purchase at the time of the incident. (Phelps Dep. at 81:12-13) ("Q: Did you find an evening gown? A: I didn't have time."). Further, prior to the incident, Phelps had already determined that she and her party should leave the store and not purchase anything. *See* (Phelps Dep. p. 81:12-18) ("[M]y whole shopping experience was ruined the moment they came over to that dressing room. They, meaning the Chattanooga police officer, loss prevention, the moment they came over there it was over for me. I was done. I'm like, you all are weirdos. I'm getting out of here. I can't even shop in peace."). Ultimately, it was Phelps' choice to leave Dillard's – Dillard's never asked her to leave before or after the incident. *See generally* Ex. 4; (Phelps Dep. at 90:2-6) ("Q: They verbally said 'leave the store.'[?] A: No."), 127:20-128:4 (explaining that in the moments after the captured video ended no one from Dillard's said anything else to her).

While, at most, Appling may have intended to enter a contract with Dillard's by purchasing one of the items she tried on in the dressing room, Phelps certainly did not. Phelps' claims cannot be decided based on the intent of her shopping companions. *See Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1103-04, 1117-18 (10th Cir. 2001) (distinguishing between the § 1981 claims of two shopping companions and holding that one plaintiff who entered into a contract with defendant stated a claim, while her companion, who made no attempt to purchase merchandise, did not have a valid claim).

Accordingly, because Phelps cannot prove an essential element of her Section 1981 claim, Phelps' claim for racial discrimination in violation of Section 1981 fails.

**II. Phelps' claim for malicious harassment under the Tennessee Human Rights Act fails.**

Phelps' claim for malicious harassment (D.E. 1 at ¶¶ 65-67) fails, because the undisputed material facts show Phelps cannot prove Dillard's (1) intentionally intimidated her or (2) that Dillard's was motivated by race. To establish a claim of malicious harassment under the Tennessee Human Rights Act (Tenn. Code Ann. §§ 4-21-701, *et seq*.), a plaintiff must show (1) "that the perpetrator intentionally intimidated the plaintiff from freely exercising a constitutional right," and (2) "that the perpetrator was motivated by the victim's race, color, religion, ancestry or national origin." *Tong v. Daly*, 2022 WL 4235066, at *5 (W.D. Tenn. Sept. 14, 2022) (citing *Washington v. Robertson County*, 29 S.W.3d 466 (Tenn. 2000)); *see also Levy v. Franks*, 159 S.W.3d 66, 80–81 (Tenn. Ct. App. 2004)). To satisfy the first element, the plaintiff must show that the defendant intimidated the plaintiff by (1) injuring or threatening to injure the plaintiff; or (2) coercing another person to do so; or (3) damaging, destroying or defacing any real or personal property of another person. *Safro v. Kennedy*, 2007 WL 1215052, at *3 (Tenn. Ct. App. Apr. 25, 2007).

Tennessee case law shows Phelps cannot prove Dillard's acted with intent to intimidate her based on her race. First, in *Brown v. Christian Bros. University*, the plaintiff was detained and handcuffed by private security because of his suspicious behavior. 428 S.W.3d 38, 44 (Tenn. Ct. App. 2013). The court affirmed the trial court's directed verdict in favor of the defendant on plaintiff's claim for malicious harassment because the plaintiff provided no proof that the private security acted with an intent to intimidate the plaintiff based on his race. *Id.* at 56. The mere fact that the plaintiff was Black was not enough satisfy the plaintiff's burden. *Id.*

Second, in *Safro*, a security guard said many insults to the plaintiff including telling the plaintiff that she should "go back to where you came from." 2007 WL 1215052, at *1. The plaintiff never alleged that the security guard explicitly threatened her, but that the combination of his

statements and body language was threatening. *Id.* at *3. After reviewing the security tape, the court found that the defendant's body language was not objectively threatening. *Id.* Therefore, the court affirmed the trial court's judgment granting the defendant's motion for summary judgment. *Id.*

A review of the cell phone footage Phelps has produced of the Incident that documents the interactions between her and the Dillard's security officer objectively does not show the security officer or other Dillard's employee (1) injuring or threatening to injure Phelps; or (2) coercing another person to do so; or (3) damaging, destroying or defacing any real or personal property of plaintiff. *See* Ex. 3; Ex. 4. Instead, the videos show the officer remained calm and never threatened any injury to Phelps. *See* Ex. 3, Ex. 4. In fact, the security officer told Phelps she was trying to "squash this and get you out of here." Ex. 4. While Phelps claims the officer's "presence was threatening," she admits the officer "didn't verbally threaten me." (Phelps Dep. at 111:2-7). Phelps also admits she was not physically injured during the incident. (Phelps Dep. at 129:20-22). Further, Phelps speculates she was stopped because of her race, claiming "if I was Becky with blonde hair and blue eyes, they would have never have stopped me," (Phelps Dep. at 148:14-149:7), but this unsupported claim is not enough to show Dillard's' actions were motivated by her race. *See Christian Bros. University*, 428 S.W.3d at 56 (finding the mere fact that plaintiff was black did not satisfy the second element of her malicious harassment claim). Because Phelps has no evidence that any Dillard's employee injured or threatened to injure her, coerced another person to do so, or damaged, or destroyed any of her real or personal property, because of her race, Phelps' claim for malicious harassment fails.

11

Case 1:21-cv-00267-CEA-SKL   Document 29   Filed 12/12/23   Page 11 of 20
PageID #: 150

**III.     Phelps' claim for intentional infliction of emotional distress at common law fails.**

Phelps' claim for intentional infliction of emotional distress (D.E. 1 at ¶¶ 68-73) fails. Phelps cannot meet the "outrageousness" standard, which is an essential element of her claim for intentional infliction of emotional distress, because Dillard's' alleged actions do not meet the standard under Tennessee law. The tort of intentional infliction of emotional distress requires the plaintiff to prove the three following elements: "(1) the conduct complained of must be intentional or reckless; (2) the conduct must be so outrageous that it is not tolerated by civilized society; and (3) the conduct complained of must result in serious mental injury." *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997). Conduct is outrageous when it goes beyond all bounds of decency and is "regarded as atrocious, and utterly intolerable in a civilized community." *Lourcey v. Est. of Scarlett*, 146 S.W.3d 48, 51 (Tenn. 2004). The standard for outrageousness is a high one; "liability clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Odom v. Claiborne Cnty., Tennessee*, 498 S.W.3d 882, 887 (Tenn. Ct. App. 2016) (quoting Restatement (Second) of Torts § 46 cmt. D), *appeal denied* (Aug. 18, 2016)). "It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so." *Brown v. Mapco Exp., Inc.*, 393 S.W.3d 696, 704 (Tenn. Ct. App. 2012) (quoting Restatement (Second) of Torts § 46 cmt. H)).

Regarding Phelps' claim for intentional infliction of emotional distress, Phelps alleges "DILLARD'S employees and agents acted intentionally, recklessly, or both when they accused Ms. PHELPS of being a thief and caused her to be subjected to conduct described above [in the Complaint]." (D.E. 1 at ¶ 68). Plaintiff alleges "given the total dearth of reasonable cause to suspect that Ms. PHELPS had stolen anything, her treatment by DILLARD'S . . . was so outrageously

atrocious as to be utterly intolerable in civilized society." (*Id*. at ¶ 69). But, Dillard's' alleged actions of – at most – accusing Phelps of stealing and detaining her to perform an investigation are not sufficient under Tennessee law to support a claim for intentional infliction of emotional distress. *See, e.g., Nasar v. Kohl's Dep't Stores, Inc*., 2019 WL 6051110, at *3 (W.D. Tenn. Nov. 15, 2019) (dismissing plaintiff's claim for intentional infliction of emotional distress where department store employees told police he was a "thief," a "thug," and a "dangerous" person that had come to steal from the store, finding it did not meet the outrageousness standard); *Goldfarb v. Baker*, 547 S.W.2d 567, 568-69 (Tenn. 1977) (professor's mistaken accusation that a student threw a pie at him, leading him to forbid the student to attend class, have the student ejected from the building when he tried to take his seat, and claim in front of others that the student was attempting to blackmail him, did not meet the outrageousness standard); *Odom*, 498 S.W.3d at 883-84, 886-87 (district attorney's statements that a woman involved in a custody dispute was a "jerk," a "troublemaker," and a "bitch" were derogatory and inappropriate but not "outrageous"); *Brown*, 393 S.W.3d at 704 (a shopkeeper's accusation that a customer was attempting a "money switch" and threat to call the police constituted a "triviality" the law does not protect); *Richards v. O'Connor Mgmt., Inc.*, 1998 WL 151392, at *1-3 (Tenn. Ct. App. Apr. 3, 1998) (finding mall management company whose security officers, in responding to mall alert for customer who inadvertently left store with gift certificate and merchandise due to employee error, screamed at customer when she returned to the mall to rectify the situation, demanded to look in her purse, detained her in a different store, escorted her to other stores in the mall "like she was under arrest for something," and may at one point have placed a hand on a sidearm when interviewing her had not engaged in "outrageous" conduct).

As the video of the Incident shows, Phelps was placed in handcuffs and searched for at most four to five minutes. *See generally* Ex. 4. The entire incident that is the crux of this lawsuit spanned only 10 minutes. (Stewart Dep. at 41:25-42:3). The officer handcuffed Phelps under suspicion of theft. (Phelps Dep. at 99:1–99:5; Second Phelps Cellphone Video, at 0:20–1:07). The officer clarified that Phelps was being detained, not arrested. (Phelps Dep. at 118:14–17; Ex. 4, at 0:28–0:54). The officer searched Phelps for stolen merchandise. (Phelps Dep. at 99:23–101:14; Ex. 4, at 1:18–3:36). The officer remained calm and never threatened any injury to Phelps. (*See* Ex. 3; Ex. 4; Phelps Dep. at 111:2-7 (admitting the officer "didn't verbally threaten me.")). Instead, the officer told Phelps she was trying to "squash this and get you out of here." (Ex. 4). Phelps was not physically injured during the incident. (Phelps Dep. at 129:20-22). Dillard's' behavior is within the bounds of common decency. Society expects Dillard's, which is in the business of, among other things, selling clothing to its customers, to investigate suspected shoplifting. A 10-minute investigation does not satisfy the "outrageously atrocious" standard required to support a claim for malicious harassment. Accordingly, summary judgment is warranted on Phelps' claim for malicious harassment.

### IV. Phelps' claim for invasion of privacy through false-light publicity fails.

Phelps' claim for invasion of privacy through false-light publicity (D.E. 1 at ¶¶ 74-77) fails because the evidence shows the Incident occurred in front of a small group of Dillard's employees and Phelps' two shopping companions which is insufficient to satisfy the "publicity" element of her claim. Tennessee recognizes false light in the public eye, i.e., false light invasion of privacy, as an actionable tort. *Brown v. Mapco Exp., Inc.*, 393 S.W.3d 696, 706 (Tenn. Ct. App. 2012) (citing *West v. Media General Convergence, Inc.*, 53 S.W.3d 640 (Tenn. 2001)). Tennessee has

adopted the definition of false light set forth in Section 652E of the Restatement (Second) of Torts as follows:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy, if:
>
> (a) The false light in which the other was placed would be highly offensive to a reasonable person, and
>
> (b) The actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.

*Id*. (citing *West*, 53 S.W.3d at 643-44 (quoting Restatement (Second) of Torts § 652E (1977))).

While Phelps alleges the incident took place "in front of many other persons – more than a small group" as part of her claim for invasion of privacy false-light publicity (D.E. 1 at ¶74), the individuals in the area at the time of the incident were merely Dillard's store employees. (*See* Exs. 3, 4; Stewart Dep. at 34:1-35:19 (listing the employees around the dressing room at the time of the incident, demonstrating that all individuals seen in Exhibits 3 and 4, besides Phelps and her shopping companions, were store employees)). Phelps cannot meet the "publicity" requirement for a claim of false light in the public eye based on statements made in the presence of her two shopping companions and Dillard's employees. *See Brown*, 393 S.W.3d at 707 (granting summary judgment on claim for false-light publicity finding that statements at issue by the defendant employees alleging he was trying to "do a money-switch" were made, at most, in the presence of 'several' unidentified customers who came in and out of the store during the incident which was insufficient to meet the "publicity" requirement for a claim of false light in the public eye.). Accordingly, Phelps' claim for false-light publicity fails.

15

### V. Phelps' claims for negligent infliction of emotional distress (premises liability) and negligent infliction of emotional distress (hiring and retention) fail.

Phelps' claims for negligent infliction of emotional distress (premises liability), (D.E. 1 at ¶¶ 78-82), and negligent infliction of emotional distress (hiring and retention), (D.E. 1 at ¶¶ 83-86), both fail because Phelps has no expert medical proof to support her claim that she suffered serious or severe emotional injury. To succeed in an action to recover for damages for a stand-alone negligent infliction of emotional distress ("NIED") claim, a plaintiff must (1) satisfy the five elements of ordinary negligence including duty, breach of duty, injury, causation in fact, and proximate cause; (2) establish a serious or severe emotional injury; and (3) support her serious or severe injury with expert medical or scientific proof. *Marla H. v. Knox Cnty.*, 361 S.W.3d 518, 529 (Tenn. Ct. App. 2011).

There are three subspecies of NIED claims, "stand-alone," "parasitic," and "bystander." *See Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 206 (Tenn. 2012). A stand-alone claim is "one for emotional disturbance alone in the absences of a physical injury." *Id.* at 206 n.10. In contrast, a parasitic claim is one where the defendant's negligent conduct results in multiple types of damages. *Id.*

If an NIED claim is stand-alone, then the plaintiff must provide expert medical or scientific proof to establish that the emotional injury is serious or severe. *See Rye v. Women's Care Ctr. of Memphis, MPLLC*, 477 S.W.3d 235, 269–70 (Tenn. 2015). If the plaintiff fails to submit expert proof to establish a serious emotional injury, then the defendant is entitled to summary judgment. *See id.* at 271. For example, in *Rye,* the Tennessee Supreme court affirmed the trial court's judgment granting defendant's motion for summary judgment because the plaintiff failed to submit any expert proof to establish a serious emotional injury despite having adequate time for discovery. *Id.* Further, in *Filson v. Seton Corp.*, the court affirmed a judgment granting the defendant's motion

16

for summary judgment because, by failing to provide expert proof to establish a serious emotional injury as part of a stand-alone NIED claim, the plaintiff failed to establish a *prima facie* NIED claim. No. M200602301COAR9CV, 2009 WL 196048, at *10 (Tenn. Ct. App. Jan. 27, 2009). As such, the defendant was entitled to summary judgment simply because the plaintiff failed to provide expert proof. *Id.*; *see also Coleman v. Wilwayco,* M2005–00075–COA–R3–CV, 2006 WL 140390, at *2, 8 (Tenn.Ct.App. Jan.17, 2006), (affirming the trial court's grant of summary judgment to defendant where the "sole ground upon which Defendants based their motion was the absence of any [expert] proof Plaintiff had suffered a severe or serious emotional injury").

Expert testimony is required to support Phelps' NIED claims. Phelps admits Dillard's' actions did not cause her physical injuries. (*See* D.E. 1; *see also* Phelps Dep. at 129:20-22). Rather, Phelps alleges she suffered only emotional injuries because of Dillard's' actions. (D.E. 1 at ¶¶ 81, 85). Because Phelps' NIED claims are for "emotional disturbance alone in the absence of physical injury," the claims are stand-alone NIED claims and she must support those claims with expert medical or scientific proof. *See Rogers*, 367 S.W.3d at 210 n.10.

Phelps' NIED claims are not supported by expert medical or scientific proof. The Amended Scheduling Order required Phelps to disclose any expert testimony under Rule 26(a)(2) of the Federal Rules of Civil Procedure on or before September 5, 2023. D.E. 22 at ¶ 1(a). Under Fed. R. Civ P. 26(a)(2), "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." "Rule 26(a)(2) divides experts into two categories: (1) an expert 'retained or employed specially to provide testimony or one whose duties as the party's employee regularly involve giving expert testimony,' who must provide a written report under Rule 26(a)(2)(B); and (2) any expert who does not need to provide a written report under Rule 26(a)(2)(B) (see Rule 26(a)(2)(C))." *Adams v. Farbota*, 306 F.R.D.

17

563, 571 (M.D. Tenn. 2015). Treating physicians typically fall into the latter category. As such, pursuant to Rule 26(a)(2)(C), an expert disclosure concerning a treating physician must state (i) the subject matter on which the witness is expected to present evidence under Fed. R. Evid. 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify. *Id*. Finally, Rule 26(a)(2)(D) requires parties disclosing such experts to do so "at the times and in the sequence that the court orders" or, absent a court order, "at least 90 days before the date of the trial or for the case to be ready for trial." *Id*.

Phelps did not disclose any expert testimony under Rule 26(a)(2) on or before September 5, 2023. Therefore, Phelps has not proffered any expert medical or scientific proof to support the allegation that her emotional injuries are serious or severe. Phelps has failed to establish a *prima facie* case for both of her NIED claims. Dillard's is therefore entitled to summary judgment dismissing Phelps' NIED claims.

## CONCLUSION

Considering the undisputed material facts, Phelps' claims for (1) racial discrimination in violation of section 1981 (D.E. 1 at ¶¶ 47-56), (2) malicious harassment under the Tennessee Human Rights Act (*id*. at ¶¶ 65-67), (3) intentional infliction of emotional distress (*id*. at ¶¶ 68-73), (4) invasion of privacy through false-light publicity (*id*. at ¶¶ 74-77), (5) negligent infliction of emotional distress (premises liability) (*id*. at ¶¶ 78-82), and (6) negligent infliction of emotional distress (hiring and retention) (*id*. at ¶¶ 83-86) all fail. Accordingly, Dillard's respectfully requests the Court grant summary judgment to Dillard's on those claims.

Respectfully submitted this 12th day of December, 2023.

    _s/ *Ashley B. Gibson*_____
Ashley B. Gibson (BPR No. 034140)
633 Chestnut Street, Suite 1900
Chattanooga, TN  37450
Phone: (423) 756-2010
abgibson@bakerdonelson.com

and

Clarence Risin (BPR No. 016874)
1600 West End Ave. Ste 2000
Nashville, TN 37203
(615) 726-5576
crisin@bakerdonelson.com

*Counsel for Defendant*

**CERTIFICATE OF SERVICE**

       I hereby certify that the foregoing was filed electronically on December 12, 2023. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular United States mail. Parties may access this filing through the Court's electronic filing system.

       APPERSON CRUMP, PLC
       Jacob Webster Brown (BPR No. 36404)
       APPERSON CRUMP, PLC
       6000 Poplar Avenue, Suite 150
       Memphis, TN 38119
       Phone: (901) 756-6300
       jbrown@appersoncrump.com

       /s/ *Ashley B. Gibson*_____
       Attorney

20

Case 1:21-cv-00267-CEA-SKL   Document 29   Filed 12/12/23   Page 20 of 20
PageID #: 159