IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| ARTELIA PHELPS, *Plaintiff*, v. DILLARD TENNESSEE OPERATING LIMITED PARTNERSHIP d/b/a DILLARD'S, *Defendant*. | Case No. 1:21-cv-267 CEA/SKL **JURY DEMAND** |

## PLAINTIFF ARTELIA PHELPS' TRIAL BRIEF

### I. INTRODUCTION

The Plaintiff, Artelia Phelps, anticipates the evidence at trial will prove the Defendant, Dillard Tennessee Operating Limited Partnership ("Dillard's"), liable to her at common law, through its agents, for false imprisonment and battery. The testimony and video will prove that Dillard's agents held and restrained Ms. Phelps against her will, and they touched her person in a patently offensive manner. The case will turn on whether those agents, in so doing, acted unlawfully. They did. Dillard's lacked probable cause to suspect Ms. Phelps of theft—the only *lawful* basis for the store to have held her. Independent from the probable-cause question, Dillard's restrained Ms. Phelps through unreasonable manner and means, and with an excessive amount of force.

### II. SUMMARY OF FACTS

On November 3, 2020, Ms. Phelps walked into Dillard's department store at the Hamilton Mall with her sister, LaShonda Appling, and her nephew, Shondrick Smith. Phelps Dep. (ECF No.

38-1) 44:18–19. As the three entered Dillard's from the rest of the mall, Ms. Phelps made eye contact with a female, uniformed police or security officer, employed by Dillard's, walking out of the store in the opposite direction. *Id.* at 60: 21–24. The officer saw Ms. Phelps enter the store wearing the same black jeans the officer would later accuse Ms. Phelps of stealing. As the ladies and Shondrick passed the officer and entered the store, the officer turned around and walked back in after them. *Id.* at 60:1–2, 18–19.

The security officer followed the ladies as they browsed eveningwear, making them feel uncomfortable. *See id.* at 58: 16–18 ("Every time I looked up there she is. So I was distracted by her presence. Like, I kept w[o]ndering, like, what does she want; what is she doing[?]"). Ms. Phelps then saw the security officer cross the room and speak with a white, male Dillard's sales associate while "gesturing" in the ladies' direction. *Id.* at 59:3–5. The gesture did not look friendly, but accusatory. *See id.* at 62:8–11. ("[S]he diverted the sales associate's attention to us, and it didn't seem like it was in a helpful way, like not to go help them but go watch them."). Notably, Ms. Phelps and her sister appeared to be the only two black women shopping in the store. *See id.* 149:5–7 ("I was . . . susp[ected] of theft because I was one of two and maybe only black people that was in the whole store.").

When each of the two ladies had picked something out for herself, they briefly split. Ms. Phelps stopped by the ladies restroom. Ms. Appling went to the fitting rooms to try on both eveningwear pieces. While Ms. Phelps planned to buy one of the pieces for herself, she did not want to try on clothes while on her menstrual cycle. *Id.* at 77:4, 8–9 ("I'm on my cycle so I'm not doing any of that."). She preferred to see how the piece she liked fit her sister. Because the ladies shared the same size, either could try on clothes for the other. *Id.* at 77:2–3 ("[T]he reason Lashonda is trying on clothes and not me is because we're the same size, okay?").

After the restroom, Ms. Phelps went to meet her sister in the ladies' dressing rooms. As she approached the dressing rooms, she saw three white women exiting the dressing-room area "with no clothes . . . in their hands," which seemed to her suspicious. *See id.* at 75: 10, 17–18. It *was* suspicious. No one bothered those women, however. *See id.* at 75:18–19 ("[N]o one was paying them any attention. Just us.").

Ms. Phelps reached the dressing-room area and stood outside the dressing room while Ms. Appling tried on the two eveningwear pieces. As Ms. Phelps and her nephew stood outside the dressing-room door, four Dillard's employees—two male loss-prevention employees, a "brown haired middle aged white woman," and the security officer—walked into the dressing-room area. *See id.* at 82:11–13. One of the loss-prevention men approached Ms. Phelps and said, "We're looking for the jeans to go with these tags." *Id.* at 83:9–10.[1]

At first, Ms. Phelps did not realize anyone accused her of anything. *See id.* at 81:4–6 ("When he had said jeans, that cut me out of the whole equation because I'm here for evening gowns. I don't know what jeans he's talking about."). Then the security officer entered the dressing room where Ms. Appling was changing. *Id.* at 84:1–4 ("She walked in there to look around while my stepsister was in there taking her clothes off and attempting to put on the second piece that she never got."). Inside the dressing room, the security officer stated to the three employees outside, "There's no one else in there but her," referring to Ms. Appling. *Id.*: 86:9–10.

The three employees still outside the fitting room next turned to Ms. Phelps, and one accused her of wearing store merchandise. *Id.* at 86:18–22 ("So they're all three standing there together facing me now, okay? And then the white loss prevention officer says 'what jeans she got

---

[1] In fairness, Ms. Phelps did recall that the employee held in his hands what might have been "about two or three" clothing tags. *See id.* at 83:13–18.

on' just casually. 'Are those our jeans she has on?' And 'I think those are our jeans she has on.'").

As Ms. Phelps stood there, trying to comprehend what was happening, wearing the same clothes she had on when she entered the store—the same clothes the security officer had *seen* her wearing—Dillard's loss-prevention officer accused her of trying to steal the shoes she had on, too. *Id.* 87:2–3 ("[T]hen the white LP officer then says, "and I think those are our shoes.").

By this time Ms. Phelps wanted to leave. She recalled telling her sister, "It's time to go," *id.* at 87:7–8, and she can be heard on the cell-phone video she and her nephew took of the incident saying, "Shonda, let's go," Ex. 3 to Mem. Supp. Def.'s Mot. Summ. J (Not. Manual Filing, ECF No. 28-3) 00:03. But the four Dillard's employees did not let her leave. They detained Ms. Phelps on suspicion of theft. Phelps Dep. (ECF No. 38-1) 91:17–20 ("Outside of the dressing room []waiting for LaShonda, that's when they accused me. And detained me for suspicion of thieving—stealing. They alleged I put their clothes on.").

Now outside the dressing-room hallway—in the open, public part of the store—the security officer expressly detained Ms. Phelps on suspicion of shoplifting and approached to handcuff her. When Ms. Phelps asked the officer, "Am I under arrest?," the officer answered, "I'm detaining you for suspicion of shoplifting. So, yes."[2] Ex. 4 to Def.'s Mot. Summ. J. (ECF No. 38-1) 00:36–00:38; *see also* Phelps Dep. (ECF No. 38-1) 99:8–9 ("I asked her was I under arrest and she answered

---

[2] After Ms. Phelps told her sister to call an attorney, the security officer sang a slightly different song: "Right now you're not under arrest; you're being detained." Ex. 4 to Def.'s Mot. Summ. J. (ECF No. 28-3) 00:52. The significance of that mid-apprehension pronouncement appears questionable at best. As this Court has observed, the distinction between arrest and detention can prove slippery. *See United States v. Wynn*, No. 1:21-cr-32, 2022 WL 1658417, at *2 (E.D. Tenn. May 25, 2022) ("There is 'no bright-rule defining the length or scope of a *Terry* stop or when such a stop becomes an arrest." (quoting *Sutton v. Metro. Gov't of Nashville & Davidson Cty.*, 700 F.3d 865, 876 (6th Cir 2012))).

yes. "I am detaining you for suspicion of theft."). The officer took out handcuffs and told Ms. Phelps to turn around. Ex. 4 to Def.'s Mot. Summ. J. (ECF No. 38-1) 00:42.

Frustrated and indignant—but fully in control of herself and posing no threat—Ms. Phelps followed the officer's instructions and extended her hands behind her: an act of total compliance. *Id.* at 00:43–01:01. Despite Ms. Phelps' compliance, lack of aggression, and the absurdity of thinking Ms. Phelps had a hidden a pistol or shank in the same jeans she was trying to steal, the security officer frisked Ms. Phelps for weapons. *Id.* at 01:21–01:25 ("Okay, I'm gonna check. I have that right to pat you down for weapons or anything that might hurt me.").

Ms. Phelps now stood handcuffed in the open department store, in full view of other shoppers, accused by Dillard's of trying to steal the same clothes she had entered the store wearing. *See id.* at 01:26–32. None of the employees tried to move things to a more discreet location. *See generally id.* The whole spectacle—handcuffs, pat down, and all—unfolded "right outside the dressing room[s]," Phelps Dep. (ECF No. 38-1) 95:5–6. There in the open, with Ms. Phelps feeling exposed, helpless, and humiliated, the security officer prodded her waist, then reached inside her jeans—all in an effort to prove her a thief. That part of the incident in particular stuck with Ms. Phelps:

> A: . . . [T]he white police officer stuck her hands down the back of my pants.
>
> Q: Okay.
>
> A: That's hard to say. I'm sorry. The white police officer stuck her hands down my pants while everybody watched and I could do nothing but let her do it. I could do nothing but comply. I felt helpless. I felt powerless. I felt voiceless. She stuck her hands down my pants, [Mr. Risin], is what she did.

*Id.* at 101:6–14. And the preposterousness of Dillard's initial accusation made everything worse. *See id.* at 101:23–102:2 ("There was no way that I could have done what they say I did. No way.

5

For them to put me in handcuffs in front of everybody in that store and humiliate me and put their hands on my body and my clothes . . . ."). As a final indignity, the officer, acting at Dillard's direction, insisted on checking the labels on Ms. Phelps' jeans multiple times. *See id.* at 127:7–10 ("[A]fter she'd already checked and saw that it wasn't her jeans she kept going and checked and rechecked and checked again. She keeps—it's like the tags are going to change.").

After the humiliating search of Ms. Phelps, the officer uncuffed Ms. Phelps. Ms. Phelps and her companions then left the store. She will testify that the Dillard's employees who accused her of stealing, through their hostility toward her, forced her from the store:

> Q: . . . And when you say you're forced out of the store, what do you mean?
>
> A: I was forced out by a . . . hostile shopping environment.
>
> Q: Okay. Were you told to leave the store?
>
> A: In so many words, yes. I was put in handcuffs.
>
> Q: Okay.
>
> A: I was treated like a criminal. So my shopping experience had been ruined. It was over.
>
> Q: Okay.
>
> A: They treated me terrible. They—they wanted me to leave.

Phelps Dep. (ECF No. 38-1) 89: 10–22.

### III. LAW AND ARGUMENT

#### A. *Dillard's lacked probable cause to detain Ms. Phelps against her will.*

The evidence at trial will show Dillard's lacked probable cause to suspect Ms. Phelps of shoplifting. As Dillard's points out, the probable-cause standard requires "the existence of such facts and circumstances sufficient to excite in a reasonable mind the belief that the accused is guilty

of the crime charged." *Roberts v. Federal Express Corp.*, 842 S.W.2d 246, 248 (Tenn 1992); *Brown v. SCOA Indus., Inc.*, 741 S.W.2d 916, 919 (Tenn. Ct. App. 1987). To date Dillard's has not—and Ms. Phelps maintains it *can*not—point to discrete facts and circumstances sufficient to excite a reasonable mind that she was guilty of the alleged offense.

Dillard's has yet to articulate any specific behavior by Ms. Phelps that could lend itself to reasonable suspicion of shoplifting. In fact, the behavior of Ms. Phelps and other relevant circumstances point to the opposite conclusion. When Ms. Phelps entered the store, she made eye contact with the same security officer who would later handcuff and searched her. The security officer could not have reasonably suspected Ms. Phelps of trying to steal the clothes she had walked in wearing. The same was true for the other Dillard's agents, who had seen Ms. Phelps browsing around the store.

### B. *Even assuming probable cause, Dillard's detained Ms. Phelps through unreasonable manner and means, and an excessive amount of force for the circumstances.*

Even if Dillard's could demonstrate it had probable cause to suspect Ms. Phelps of theft, the evidence will show its agents detained her in an unreasonable manner, with unreasonable means, and using an excessive amount of force. The shopkeeper's privilege will therefore not avail Dillard's.

Ms. Phelp's concedes the ordeal happened fast. But the problem with her approximately ten-minute detention—roughly half of that spent in handcuffs—did not owe to the legnth of time Dillard's held her. Time represents only one part of a several-element standard. To prevail under the shopkeeper's privilege, Dillard's must also prove it restrained Ms. Phelps in a reasonable *manner*, through reasonable *means*, using a reasonable amount of *force*.

Ms. Phelps will ask the jury to consider the public nature of the detention. Dillard's handcuffed and searched her in full view of other shoppers in the store. Its agents left her no

7

recourse but compliance and subjected her to strangers placing their hands in her pants—the same she had walked into the store wearing. Ms. Phelps was also publicly searched for weapons. Ex. 4 to Def's Mot. Summ. J. (ECF No. 28-3) 01:21-01:25. The idea that Ms. Phelps had hidden a weapon in the very pants she was attempting to steal is contrary to common sense and unreasonable.

### C. *The officer's search of Ms. Phelps' person constituted intentional, unlawful, and offensive physical contact.*

A battery is any intentional, unlawful, and harmful or offensive physical contact by one person with another person. The intent required for a battery is not the intent to cause harm or offense per se, to do the act that causes the harm or offense. Committee on Pattern Jury Instructions, *Tennessee Pattern jury Instructions—Civil*, T.P.I. Civil 8.03 (17th ed. 2017). Here, Dillard's security officer, repeatedly reached *inside* Ms. Phelps' pants. It is inconceivable that this was done without the officer having made an affirmative decision to take that measure. In fact, not only was there intent, but the officer informed Ms. Phelps of her intent on the occasion in which the officer stated Ms. Phelps was being searched for weapons. With respect to the unlawful prong of the analysis, Ms. Phelps is confident that the jury will decide that, since there existed no reasonable grounds for her detention and search, that it was unlawful contact. Based on the totality of exhibits that will be presented to the jury, there is compelling evidence to meet Ms. Phelps' burden that the touching was harmful or offensive. The very fact that she was publicly handcuffed and searched on the sales floor is offensive to her dignity as a human being.

Much of the same analysis applies with respect to Ms. Phelps' false imprisonment. The jury must determine whether or not Ms. Phelps was compelled to stay and participate in the search. To aid them in that determination, they will view the footage of her publicly handcuffed and searched in the store. The jury will also hear the officer inform Ms. Phelps that she is being detained.

Considering these facts, Ms. Phelps is confident that the jury will determine that she was compelled to stay handcuffed on the sales floor against her will.

## IV. CONCLUSION

As such, Ms. Phelps is confident that the above facts and law will as presented in trial will result in a favorable verdict of her claims against Dillard's.

Dated April 20, 2024.

Respectfully submitted,

 */s/ Jacob Webster Brown*
Bruce M. Smith (TN 8513)
Jacob Webster Brown (TN 36404)
William R. Faulk (TN 39566)
Sara Katherine McKinney (TN 40900)
6000 Poplar Avenue, Suite 150
Memphis, TN 38119
*bsmith@appersoncrump.com*
*jbrown@appersoncrump.com*
*wfaulk@appersoncrump.com*
*smckinney@appersoncrump.com*

*Counsel for Plaintiff Artelia Phelps*

## V. CERTIFICATE OF SERVICE

I certify this Brief is filed on April 25, 2024, via the District Court's electronic-filing service, and all counsel of record will be automatically served by operation of the same.

 */s/ Jacob Webster Brown*